UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| UNITED STATES OF AMERICA,<br><br>　　　　　　　　Plaintiff,<br>　v.<br><br>CAMILO Q. PRIMERO, and AURORA S. BELTRAN<br><br>　　　　　　　　Defendants. | Case No. 2:17-cr-00205-APG-GWF<br><br>**FINDINGS AND RECOMMENDATION**<br><br>**Re: Motion to Dismiss Indictment (ECF No. 78)** |
|---|---|

This matter is before the Court on Defendant Aurora Beltran's Motion to Dismiss (ECF No. 78), filed on April 24, 2018. The Government filed its Response (ECF No. 83) on May 4, 2018, and Defendant filed her Reply (ECF No. 86) on May 11, 2018. The Court conducted a hearing in this matter on June 5, 2018.

**BACKGROUND**

Defendants Camilo Primero and Aurora Beltran are charged in a nineteen count indictment, filed on July 5, 2017, with conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349; health care fraud in violation of 18 U.S.C. § 1347; fraudulent concealment involving a federal health care program in violation of 42 U.S.C. § 1320a-7b(a)(3); false statements relating to a health benefit program in violation of 18 U.S.C. § 1035; and money laundering in violation of 18 U.S.C. § 1957. *Indictment* (ECF No. 1). Ms. Beltran moves to dismiss the indictment on the ground that she voluntarily participated in an FBI interview on May 13, 2016, during which she provided incriminating information in reliance on a promise by the FBI agents that she would not be prosecuted if she told the truth.

The indictment alleges that Defendant Primero surrendered his medical license in November 2011. As a result, the Department of Health and Human Services notified Primero

that he was excluded from participating in any capacity in the Medicare, Medicaid and all Federal health care programs---effective June 20, 2012.  Defendant Primero purchased Angel Eye Hospice in August 2009. The company furnished hospice care services that were paid almost exclusively by Medicare.  Defendant Beltran was Primero's business partner and participated in operating Angel Eye Hospice with him.  Following Primero's exclusion from the Medicare program in June 2012, Angel Eye Hospice received over $7 million in payments from Medicare through October 2015.  *Indictment* (ECF No. 1), at ¶¶ 8, 9, 10, and 13. The indictment alleges that after June 2012, Primero and Beltran concealed from the Center for Medicare & Medicaid Services ("CMS"), Primero's continuing ownership and operation of Angel Eye Hospice and other medical facilities operated by them "in order to impede, impair, obstruct, and defeat the lawful functions of CMS in administering the Medicare program." *Id.* at ¶ 21.

Ms. Beltran met with FBI Special Agent James Rogers at the FBI office on May 13, 2016.  Two other federal agents, one from the FBI and the other from Health and Human Services, Office of Inspector General ("HHS-OIG"), were present during the interview.  Ms. Beltran was not represented by counsel.  The interview was surreptitiously recorded by the agents and a DVD copy of the audio-video recording has been filed as Exhibit A to Defendant's Motion.  *See Notice of Manual Filing* (ECF No. 79).  At the outset of the interview, Agent Rogers thanked Ms. Beltran for agreeing to meet with them and answer questions about her businesses.  He stated: "You're not in any trouble.  The only reason I want to talk to you about these things is because we're trying to investigate some allegations into different businesses that were owned by Dr. Primero.  The only way you can get into trouble with us is if you are not truthful.  And that's all I can expect of you, just to provide truthful answers and everything will be fine."

Agent Rogers asked Ms. Beltran to identify her businesses.  She listed Brighton House, Vision Home Care and Angel Eye Hospice.  Ms. Beltran stated that she was partners with Dr. Primero in Brighton House.  Dr. Primero owned the property on which the business was located and she owned the business.  Ms. Beltran stated that she was the sole, one hundred percent owner of Angel Eye Hospice.  She purchased the business from Dr. Primero in June 2012 after he was

no longer able to own or operate the company because of the Medicare exclusion. Dr. Primero showed her the letter he received from Medicare (CMS) that barred him from owning a business that receives Medicare payments. Agent Rogers showed Ms. Beltran a copy of the May 13, 2012 CMS letter to Dr. Primero. Ms. Beltran confirmed that this was the letter that Dr. Primero showed to her. Ms. Beltran stated that after Dr. Primero sold Angel Eye Hospice to her, it was reported to Medicare on a form 855A.

Ms. Beltran stated that Dr. Primero was not involved in the business of Angel Eye Hospice after the sale. She also stated that he was not a partner in any of her other home health care businesses. Agent Rogers showed Ms. Beltran a copy of the Secretary of State records showing that Dr. Primero was still listed as an officer and director of the company. Ms. Beltran stated that "our receptionist" was responsible for handling the corporate records and she would ask the receptionist why Dr. Primero was still listed as an officer and director.

Agent Rogers also informed Ms. Beltran that Dr. Primero was still a signatory on Angel Eye Hospice's bank accounts to which Medicare made payments. He told her that this violated the laws prohibiting Dr. Primero from being involved in any business that received Medicare payments. Ms. Beltran stated that the bank accounts were not changed because it would have created a problem in receiving payments. Agent Rogers stated that the bank records showed that Dr. Primero was writing checks to himself and to Ms. Beltran from the Angel Eye Hospice accounts after the date of the exclusion letter and that this was illegal. Ms. Beltran stated that Dr. Primero was not receiving any payments for "salary." She stated: "If he gets it, maybe I'm paying him when I bought the company." Agent Rogers reminded Ms. Beltran that she had to be fully truthful with him and that even half-truths are lies. He told her that "if it's a mistake and he did something wrong, we don't want you to get in trouble for it."

Ms. Beltran stated that she bought the business from Dr. Primero for $1 million. She did not pay him "up-front" for the business. They had a verbal purchase agreement. The monies that Dr. Primero received from the bank accounts were payments for the sale of his interest in Angel Eye Hospice. Ms. Beltran also stated that Dr. Primero owed her $100,000 prior to the date she purchased the business. Thus, the net amount she owed him on the purchase was

1  $900,000. She did not know if Dr. Primero was still owed any money on the purchase
2  agreement.
3        Agent Rogers asked Ms. Beltran about another company, Advent Hospice. She stated
4  that Dr. Primero was involved in that company as owner with her and a third individual. Agent
5  Rogers asked her if she saw a problem with that, given Dr. Primero was not supposed to be
6  involved in any medical business receiving Medicare payments. Ms. Beltran indicated that she
7  thought Dr. Primero was prohibited from seeing patients, but she didn't think it would be a
8  problem if he was listed as an owner on an application for a business license.
9        The agents showed Ms. Beltran several checks that Dr. Primero had written to Ms.
10 Beltran. She indicated that these checks were to reimburse her for loans that she made to Dr.
11 Primero to pay the employees. Agent Rogers advised Ms. Beltran that he wanted her to be very
12 careful in answering the agents' questions because she could be considered a co-conspirator with
13 Dr. Primero in defrauding Medicare which could result in very significant jail time. The agents
14 asked Ms. Beltran where the $12 million received by Angel Eye Hospice from Medicare went.
15 She stated that it was used to pay payroll and suppliers.
16       Ms. Beltran agreed to call Dr. Primero and see if he would be willing to be interviewed
17 by the agents. During the interview with Dr. Primero later that day, Agent Rogers did not tell
18 him that he was not in any trouble, or state or suggest that he would not be prosecuted if he told
19 the truth. Agent Rogers, instead, told Dr. Primero that only the United States Attorney could
20 decide whether Dr. Primero would be prosecuted. He stated that he could not tell Dr. Primero
21 what would happen in regard to possible prosecution.
22       The Government submitted copies of Angel Eye Hospice's 2012 to 2014 Federal income
23 tax returns as attachments to its Response (ECF No. 83). The income tax returns were signed by
24 Dr. Primero and included a Schedule K which identified Dr. Primero as a partner who was paid a
25 salary from the business. Dr. Primero also reported income that he received from Angel Eye
26 Hospice on his 2012-2014 Federal income tax returns. The Government also filed copies of
27 Defendant Beltran's 2014 and 2015 Federal income tax returns on which she did not report any
28 partnership income from Angel Eye Hospice.

4

## DISCUSSION

The Government argues that Agent Rogers's alleged promise that Ms. Beltran would not be prosecuted if she answered the agents' questions truthfully is not legally enforceable because Agent Rogers did not have authority to bind the United States. In *United States v. Hudson*, 609 F.2d 1326 (9th Cir. 1979), the defendant alleged that a Secret Service Agent promised that she and the co-defendant would not be prosecuted for counterfeiting if the co-defendant cooperated in the apprehension of the supplier of the counterfeit currency. Notwithstanding this promise, a criminal complaint was filed against the defendants shortly after the meeting. In affirming the denial of the defendant's motion to dismiss, the court stated that "federal courts have long been cognizant of the responsibility of federal prosecutors meticulously to fulfill their promises. In the instant case, however, the issue is whether a federal agent not within the United States Attorney's office may bind the prosecution to promises made outside his authority." *Id.* at 1328. The court cited *United States v. Lombardozzi*, 467 F.2d 160 (2d Cir. 1972), *cert. denied*, 409 U.S. 1108, 93 S.Ct. 907 (1973) which held that a prosecutor was not bound by an FBI agent's promise that the defendant would receive concurrent federal and state sentences. There was no allegation in *Hudson* that the United States Attorney knew about or had ratified the Secret Service Agent's alleged promise. The record was also devoid of facts or allegations showing that defendant relied on the agent's promise to her detriment. *Id.* at 1329. The court stated:

> While we do not suggest that federal agents as a matter of law may never bind the prosecution to promises made to criminal defendants, nor do we hold that a defendant may under no circumstances claim third-party beneficiary status to prosecution agreements and promises, we do hold that under the facts of this case, where a federal agent is alleged to have made a promise clearly outside his authority and the defendant has incurred no detrimental reliance on this promise, fundamental fairness does not require that the United States abide by the agent's promise.

*Id.*, 609 F.2d at 1329.

Defendant argues that *Hudson* permits enforcement of a promise not to prosecute if the defendant detrimentally relied on the promise, notwithstanding that the federal agent did not

5

have actual authority to make the promise. Subsequent Ninth Circuit decisions have made clear, however, that enforcement of a promise not to prosecute in exchange for cooperation is subject to two conditions: (1) the agent must be authorized to make the promise; and (2) the defendant must rely to his detriment on that promise. *Johnson v. Lumpkin*, 769 F.2d 630, 633 (9th Cir. 1985) (citing *Hudson*, 609 F.2d at 1329 and *United States v. Goodrich*, 493 F.2d, 390 393 (9th Cir. 1974)); *Thomas v. I.N.S.*, 35 F.3d 1332, 1337 (9th Cir. 1994); and *United States v. Johnson*, 622 Fed.Appx. 626, 627 (9th Cir. Nov. 6, 2015) (unpublished memorandum).

Decisions by other Courts of Appeal have expanded on the analysis underlying the requirement that the agent have actual authority to make the promise. In *United States v. Flemmi*, 225 F.3d 78, 85 (1st Cir. 2000), the defendant acted as a confidential informant for the FBI in exchange for the agents' promise that he would not be prosecuted for crimes he committed while acting as an informant. The court stated that in order to enforce the agreement, the defendant "must show both that the promisor had actual authority to make the particular promise and that he (the defendant) detrimentally relied on it." *Id.* at 84. "[A]s a general rule, doctrines such as estoppel and apparent authority are not available to bind the federal sovereign. (citation omitted). Thus, the inquiry into the scope of the FBI agents' authority here must be framed in terms of actual authority." *Id.* at 85. Actual authority may be express or implied. Express authority to bind the government exists only if the Constitution, a federal statute or a duly promulgated regulation grants such authority in clear and unequivocal terms. *Id.* Actual authority may be implied if the act is integral to the tasks assigned to the agent, or otherwise necessary to the due accomplishment of those tasks. *Id.* Thus, the authority of a United States Attorney to promise immunity from prosecution may be implied from his express authority to prosecute crimes on behalf of the United States. The duties of FBI agents, however, are investigatory in nature. The authority to promise immunity from prosecution cannot be implied from the agent's authority to investigate criminal activity. *Id.* at 85-86. In support of its holding, the court cited the following decisions, among others: *United States v. Fuzer*, 18 F.3d 517, 520-21 (7th Cir. 1994) (ATF agents lacked authority to promise that defendant would not be prosecuted); *United States v. Kettering*, 861 F.2d 675, 676 (11th Cir. 1988) (DEA agent lacked

6

1  authority to guarantee immunity); *In re Corrugated Container Antitrust Litig.*, 662 F.2d 875, 888
2  (D.C. Cir. 1981) (FBI agent did not have authority to promise immunity); and *Hudson, supra.*
3  More recently, the Tenth Circuit in *United States v. Lilly*, 810 F.3d 1205, 1212-15 (10th
4  Cir 2016) has followed *Flemmi* and the cases cited therein, including *Hudson*, in holding that
5  DEA agents did not have actual authority to grant a defendant immunity from prosecution in
6  exchange for his cooperation in their investigation.
7  There is no evidence in this case that the United States Attorney authorized FBI Special
8  Agent Rogers to promise Ms. Beltran immunity from prosecution if she provided truthful
9  information about Dr. Primero's ownership or participation in health care businesses that
10  received payments from Medicare. Nor is there any evidence that United States Attorney ratified
11  the cooperation agreement, such as by requiring Ms. Beltran to testify before the grand jury on
12  pain of being held in contempt if she refused. *See United States v. Carrillo*, 709 F.2d 35, 36-37
13  (9th Cir. 1983). Agent Rogers' alleged promise is therefore unenforceable under principles of
14  contract based on the absence of actual authority to make the promise.
15  The Government argues that even if Agent Rogers' alleged promise was enforceable, Ms.
16  Beltran breached the agreement by making false statements to the agents. The Government has
17  the burden of proving by a preponderance of the evidence that a defendant breached a
18  cooperation agreement. *United States v. Mark*, 795 F.3d 1102, 1105 (9th Cir. 2015) (citing
19  *United States v. Carrillo*, 709 F.2d at 37). Ms. Beltran told Agent Rogers that she purchased
20  Angel Eye Hospice from Dr. Primero in June 2012 and became the sole, one hundred percent
21  owner of the business at that time. Her subsequent statements during the interview cast
22  substantial doubt on the truthfulness of this statement. Ms. Beltran was confronted with
23  information that Dr. Primero continued to be listed as an officer and director of Angel Eye
24  Hospice in filings with the Secretary of State; that he was a signatory on the company's bank
25  accounts; and wrote checks to himself and Ms. Beltran from those accounts after June 2012. Ms.
26  Beltran stated that she purchased the business from Dr. Beltran for $1 million, but that no written
27  purchase agreement existed between them. Ms. Beltran also stated that she made loans to Dr.
28  Primero to pay employees which was contrary to him not being involved in the business. In

addition to Ms. Beltran's interview statements, the Government has produced tax returns for the years 2012 to 2015 signed by Dr. Primero which identify him as a partner in Angel Eye Hospice, and show that he received income from that company. Conversely, Ms. Beltran's personal income tax returns do not include any income that she received from Angel Eye Hospice. The Government has satisfied its burden of showing that Ms. Beltran made an provide truthful statements during the interview. Thus, the agreement not to prosecute her would not be enforceable even if Agent Rogers had actual authority to make the promise.

       Ms. Beltran argues that Agent Rogers' promise that she would not be prosecuted should be enforced on grounds of fundamental fairness. In *United States v. Williams*, 780 F.2d 802, 803 (9th Cir. 1986), the court stated that an exception to the requirement that the federal agent have actually authority "has been recognized where, although the United States Attorney was not a party to the cooperation agreement, breach of the agreement rendered the prosecution fundamentally unfair." The court cited *United States v. Rodman*, 519 F.2d 1058, 1059-60 (1st Cir. 1975) (per curiam) as authority for this proposition. In *Rodman*, the SEC promised to recommend that the United States Attorney's Office not prosecute the defendant if she cooperated in the SEC's investigation. The defendant provided substantial information in reliance on the promise, including making incriminating statements against herself. The SEC, however, failed to make the promised recommendation. The district court in *Williams* distinguished *Rodman* on the grounds that the SEC was directly involved in the prosecution process, whereas the Veterans Administration was not. In affirming denial of the motion to dismiss, the Ninth Circuit also stated that *Rodman* was inapplicable because the VA director only promised to recommend that the charges be dismissed if defendant agreed to resign from his job with the VA. The defendant was not induced by the promise to incriminate himself or provide information useful to the government in developing the case against him. He, therefore, did not suffer any prejudice which might render his conviction unfair. *Id.* at 803.

       *Flemmi* and *Lilly* state that the fundamental fairness exception to the requirement that the agent have actual authority is narrow, and should only apply in circumstances where the fairness concerns are exceptionally acute or extraordinary. *Flemmi*, 225 F.3d at 88; *Lilly*, 810 F.3d at

1216. In other contexts, the Ninth Circuit has made clear that dismissal of an indictment based on substantive due process grounds requires the defendant to meet an extremely high standard. "A prosecution results from outrageous government conduct when the actions of law enforcement officers or informants are 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *United States v. Pedrin*, 797 F.3d 792, 795 (9thCir. 2015) (quoting *United States v. Russell*, 411 U.S. 423, 431-32, 93 S.Ct. 1637 (1973)). "Dismissals are 'limited to extreme cases in which the government's conduct violates fundamental fairness.'" *Id.* (quoting *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003)). "An indictment can be dismissed only where the government's conduct is 'so shocking and so outrageous as to violate the universal sense of justice.'" *Id.* at 795-96 (quoting *United States v. Stinson*, 647 F.3d 1196, 1209 (9th Cir. 2011). Although the test for dismissing an indictment on grounds of fundamental unfairness, when a defendant has relied to her detriment on a promise not to prosecute, has not been clearly articulated, there is no reason to believe the Ninth Circuit will apply a lesser standard for dismissal in this context than in others.

Even absent outrageous government conduct, the court has the supervisory authority to dismiss an indictment in order to "'remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or to deter future illegal conduct.'" *United States v. Archie*, 2016 WL 475234, at 2 (D.Nev. Feb. 8, 2016) (quoting *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991) and *United States v. W.R. Grace*, 526 F.3d 499, 511 n.9 (9th Cir. 2008) (en banc)). To warrant dismissal under the court's supervisory powers, the governmental misconduct must be "flagrant" and must cause substantial prejudice to the defendant. *Id.* (citing *Barrera-Moreno*, 951 F.2d at 1093). In addition, no lesser remedy may be available to address the misconduct. *Id.* (citing *United States v. Chapman*, 524 F.3d 1073, 1087 (9th Cir. 2008)). Finally, the court lacks the supervisory authority to dismiss an indictment based on out-of-court actions unless a constitutional or statutory violation has occurred. *Id.* (citing *Barrera-Moreno*, 951 F.2d at 1093).

9

The circumstance in this case do rise to a level that would justify dismissal of the indictment on due process grounds or pursuant to the Court's supervisory powers. Agent Rogers began the interview by telling Ms. Beltran that she was not in any trouble and that the only way she could get into trouble with the agents was if she was not truthful. He told her to provide truthful answers and that everything would be fine. A promise that Ms. Beltran would not be prosecuted if she provided truthful statements can probably be inferred from Agent Rogers' statements. Agent Rogers did not, however, make any explicit representation that he was authorized by the United States Attorney to promise Ms. Beltran immunity from prosecution. Agent Rogers also qualified his statements that Ms. Beltran was not in trouble and "everything would be fine" as the interview progressed. He warned Ms. Beltran about the consequences of being untruthful, and told her that she could be charged as a co-conspirator with Dr. Primero in health care fraud.

Ms. Beltran did not make any express confession that she knowingly conspired with Dr. Primero to violate the law. She did, however, arguably incriminate herself by stating that she was aware of the letter from CMS to Dr. Primero, barring him from being involved in a business receiving Medicare funds, when she purchased Angel Eye Hospice in May or June 2012. There is no evidence that she provided other information that the Government has been able to use to prosecute her. The Government already knew at the time of the interview that Dr. Primero was listed as an officer and director of Angel Eye Hospice after June 2012. It also knew that Dr. Primero was a signatory on the company's bank accounts and had written checks to himself and Ms. Beltran from those accounts. The Government subsequently obtained federal income tax returns which establish Dr. Primero's ownership interest in and income derived from Angel Eye Hospice after June 2012. Ms. Beltran argues that she relied on the promise of immunity by contacting Dr. Primero, at the request of the agents, to see if he would come in for an interview. There is no evidence, however, that the Agents told Ms. Beltran that Dr. Primero was not in trouble or that he would not be prosecuted. The fact that Dr. Primero voluntarily met with the agents is not sufficient to constitute detrimental reliance on the part of Defendant Beltran.

Even if Ms. Beltran relied on the promise that she would not be prosecuted, any detriment she allegedly suffered as a result does not justify dismissal of the indictment. The Government had reasonable grounds to believe that Ms. Beltran was not truthful when she stated that she had purchased one hundred percent ownership of Angel Eye Hospice from Dr. Primero in 2012 and that he had no interest in the business after that date. The Government is not bound by any notion of good faith or fairness not to prosecute where, as here, the defendant was untruthful about a material fact upon which the alleged promise was predicated.

Defendant Beltran has not identified any constitutional or statutory violation committed by the Government. She was not in custody at the time of the interview, and the agents were not required to advise her of her *Miranda* rights. The lesser remedy of excluding Ms. Beltran's statements would also be available if the agents' conduct was flagrant.

## CONCLUSION

Defendant Beltran has failed to make the requisite showing that the indictment should be dismissed based on principles of contract or as a matter of fundamental fairness. Accordingly,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Defendant Beltran's Motion to Dismiss (ECF No. 78) be **denied**.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985).

. . .

This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 12th of June, 2018.

*/s/ George Foley Jr.*
_____
**GEORGE FOLEY, JR.**
**UNITED STATES MAGISTRATE JUDGE**